UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLLINOIS
EASTERN DIVISION

| | |
|---|---|
| STACEY A. COLEMAN,<br><br>    Plaintiff,<br><br>vs.<br><br>ILLINOIS DEPARTMENT OF HUMAN SERVICES f/k/a ILLINOIS DEPARTMENT OF MENTAL HEALTH, MICHAEL JANKOWSKI, CHRISTINE HAMMOND, and JERI GULLI,<br><br>    Defendants. | Case No. 09 C 3596<br><br>Hon. Joan H. Lefkow<br>Magistrate Judge Michael T. Mason<br><br>Jury Demand |

## RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Amy R. Jonker (ajonker@dykema.com)
DYKEMA GOSSETT PLLC
10 South Wacker Drive, Suite 2300
Chicago, Illinois 60606
Phone: 312-876-1700
Fax:    312-627-2302
Court-Appointed Counsel for Plaintiff

Instead of establishing entitlement to summary judgment, Defendants' Motion for Summary Judgment ("Motion") demonstrates the disputed material facts in this case, shows that Plaintiff, Stacey A. Coleman ("Coleman"), has developed evidence to support each of her claims, and shows that Defendants' arguments do not follow the law of the Seventh Circuit. Accordingly, summary judgment should be denied and this case should proceed to a trial.

## SUMMARY OF FACTS

Coleman, an African-American female, worked for the Illinois Department of Human Services ("IDHS") for eight years and seven months as a Support Service Worker. Defendants' Statement of Material Facts ("DSF") ¶ 1. Between April 2006 and April 2007, Coleman applied for and was granted three leaves under the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq*. ("FMLA"): one to intermittently care for her asthmatic daughter, one to intermittently care for her disabled mother, and one to intermittently care for her own chronic conditions. Plaintiff's Statement of Additional Facts ("PSF") ¶¶ 4, 10, 36. Despite approving each of Coleman's FMLA leave applications, Defendants counted at least nine days of FMLA leave against Coleman as unexcused absences ("UAs") in violation of IDHS' FMLA policy, which prohibits using FMLA qualified leave as the basis of disciplinary action against an employee and is not considered under the Affirmative Attendance Agreements. PSF ¶¶ 5, 7-8, 11, 19, 21-23, 26; DSF ¶ 14. In April 2007, Defendants Hammond and Jankowski held a pre-disciplinary hearing with Coleman and suspended her pending discharge for affirmative attendance violations which included days Coleman took off as FMLA leave. DE 117-6, Ex. 2, 05173-74. In June 2007, Defendants terminated Coleman for "Abuse of Time" in violation of IDHS' Affirmative Attendance Agreement" based on absences she incurred by using her FMLA leave. DSF ¶ 17.

Defendants wrongly justified counting Coleman's FMLA-covered days off as UAs by stating that when she requested those days off Coleman did not call in one hour prior to the start of her shift in violation of Howe Center policy. DE 117-6, 05174 ("Called off late" listed as reason for UA for February 24, 26, March 12, 17, 27, and April 2). But when Coleman turned in

1

her time off requests, she explained her reason for calling in late, provided medical certification for it, and Hammond told her that the time off requests would be back-dated as FMLA-covered despite the late call-ins. PSF ¶¶ 5-8, 11-13, 17-19, 21-23, 25-26. Hammond later reneged on those promises and fired Coleman even though Hammond had the authority to waive the one hour call-in requirement and had sufficient justification under the FMLA to do so. PSF ¶¶ 26-30, 32-36; DSF ¶ 66. Hammond lied about Coleman's submission of her FMLA application in a report supporting her termination recommendation and Gulli delayed approving Coleman's FMLA application until after the termination recommendation had begun processing. DSF ¶ 55; PSF ¶ 35. Defendants also wrongly counted certain days off as UAs against Coleman and used them to fire her despite IDHS policies that authorized Coleman to take those days off. PSF ¶ 5, 7-8, 13-15, 20-21. At all relevant times, Coleman performed her job satisfactorily and met Defendant's legitimate expectations. PSF ¶ 38. In contrast to Coleman, other employees outside of Coleman's protected class were not disciplined for refusing mandatory overtime or taking multiple FMLA leaves. PSF ¶¶ 21, 39-40.

## ARGUMENT[1]

**A. Coleman Can Establish a Prima Facie Case of Race Discrimination.**

Coleman establishes a prima facie case of race discrimination. To do so, Coleman must simply establish that (1) she is black, (2) she was performing up to Defendants' legitimate job expectations, (3) she suffered an adverse employment action, and (4) similarly situated non-black employees were treated more favorably. *Hildebrandt*, 347 F.3d at 1030. There is no dispute in this case as to Coleman's race.

    **1.    Job Performance.**

---

[1] Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Flores v. Preferred Tech. Group*, 182 F.3d 512, 514 (7th Cir. 1999). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). It is the movant's burden to establish the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

2

Defendants contend that Coleman cannot establish a *prima facie* case of race discrimination because she did not meet Defendants' legitimate job expectations due to (a) excessive unauthorized absences and (b) "conduct detrimental to operations." DE 116, p. 3. Defendants are wrong. First, Defendants' reliance upon the alleged unexecuted absences is misplaced because the absences at issue should have been counted as excused FMLA leave. Second, the conduct Defendants complain of as purportedly "detrimental to operations" was cooked up to make Coleman look bad as part of Defendants' scheme to discriminate against her.

Defendants improperly counted unauthorized absences ("UAs") against Coleman instead of FMLA–covered absences to discriminate and retaliate against her for taking multiple FMLA leaves in what they deemed an abuse of the FMLA. If Defendants had properly excused Coleman's FMLA-covered absences, she would not have been eligible for termination under the Affirmative Attendance Policy.

Of the sixteen UAs that Defendants rely upon to justify Coleman's termination, nine should not have been counted as UAs. Coleman was given UAs for March 4 and August 4, 2006, February 6, 10, 24, 26, and March 12, 27, and April 2, 2007, despite having been granted FMLA leave to care for her daughter's asthma, her mother's congestive heart failure, and her own chronic migraine headaches. All should have been counted as FMLA-covered absences except for February 10, which should have been excused as sick leave for bereavement for her grandmother's death. If Defendants had properly counted Coleman FMLA-covered absences and given her bereavement leave, which they unjustifiably denied, Coleman would have had only seven UAs, which is not enough to be terminated under IDHS policy.

Instead, Hammond and Jankowski gave Coleman unjustified UAs for each of those absences. For the last seven UAs (February 6, 10, 24, 26, and March 12, 27, and April 2, 2007),[2] Hammond and Jankowski gave Coleman UAs merely because she called in "late" in what they

---

[2] Coleman does not dispute the UA for March 17, 2007.

3

claim were violations of the Howe Center's one hour call-in policy ("One Hour Call Off Policy"). Response to DSF ¶ 66. That policy requires employees to call in one hour prior to the start of their shifts in order to take the day off so that if a shift started at 6:00 a.m., the employee would have to call off to request an excused absence by 5:00 a.m. However, the One Hour Call Off Policy does not state that it applies to FMLA-covered leave. *Id*. Moreover, department supervisors, including Hammond, had the authority and discretion to waive the One Hour Call Off Policy. *Id*.

For the last seven UAs, which includes the UAs Hammond and Jankowski identified as the basis for firing Coleman, Coleman had called off either during the hour immediately prior to the start of her shift or shortly after her shift had started to request FMLA-covered absences. That was in compliance with IDHS' FMLA policy which requires notice "as soon as practicable" and defines "as soon as practicable" as "At least verbal notice to the supervisor within one work day of learning of the need to take FMLA-covered time off." Response to DSF ¶ 66. When she called off, Coleman identified her need for FMLA-covered time off and then timely completed time off request forms and supplied medical documentation of her need for FMLA-covered time off. Coleman repeatedly informed Hammond and Jankowski that the migraine medication for her FMLA-covered medical condition made her extremely sleepy and sometimes unable to wake up and caused her to sleep through her alarm. Consequently, Coleman called in late on some days that she needed to take FMLA-covered leave but the lateness was limited to calling in, at most, twenty-five minutes after the start of her shift.

Importantly, Defendants never told Coleman that her late call-ins for FMLA-covered days off would be counted as UAs against her until the April 20, 2007 pre-disciplinary hearing. Immediately after that hearing, Hammond and Jankowski recommended Coleman's termination based on the late call-ins so that Coleman never received any prior notice or discipline from Hammond or Jankowski that the late call-ins for FMLA-covered leave would be counted as UAs against her. Hammond and Jankowski ignored Coleman's explanations and proof that she had

4

overslept due to the migraine medication for her FMLA-covered condition and Hammond refused to exercise her authority to waive the One Hour Call-Off Policy despite that proof. Hammond even sarcastically stated in her deposition that she had never waived the One Hour Call-Off Policy for oversleeping. Hammond's based her decision not to waive the One Hour Call-Off Policy for Coleman on Hammond's racist belief that African-American employees who took multiple FMLA leaves were abusing the FMLA but white employees who did so were not.

Regardless of the One Hour Call-Off Policy, Coleman satisfied the FMLA notice requirements by giving notice of her need for FMLA leave as soon as she reasonably could. On each day that she received a UA for FMLA-covered leave, Coleman called in, verbally stated her need for FMLA leave, verbally informed Hammond of her medical condition requiring intermittent FMLA leave, provided documents to prove her medical condition, and applied for and was approved for FMLA leave. Defendants will likely reply that they were not required to count Coleman's UAs as FMLA-covered because she turned in her FMLA application for her own FMLA leave in April 2007 but started accumulating the FMLA-related absences for herself in February 2007 in violation of the fifteen day deadline. But IDHS' FMLA policy permits FMLA leave to be applied retroactively when "the department knows the reason for the time off but has been unable to confirm that it is FMLA-qualifying, or where the requested medical certification has not yet been received . . . .".

Hammond as the supervisor knew the reason for the time off and knew that Coleman was waiting for tests to be completed to determine the cause and diagnosis of her suddenly severe migraines so that she could seek FMLA leave for herself. Hammond even told Coleman on several occasions that her requested FMLA-covered absences would be back-dated once Coleman got her FMLA leave approved. When Hammond gave Coleman the pre-disciplinary meeting notice in April 2007 Coleman immediately sought the FMLA medical certification from her doctor based on her previous 2006 migraine diagnosis but was delayed because her doctor was on vacation. That FMLA leave was approved and Coleman informed Defendants of all of

5

this. Thus, Hammond and Jankowski could have counted the FMLA-related absences as FMLA-covered under IDHS policy but intentionally chose not to because they believed that Coleman's race meant that she was abusing FMLA leave by taking multiples leaves but that white employees who took multiple leaves were not.

By doing so, Defendants violated IDHS FMLA policy that FMLA leave could not be counted against an employee for disciplinary actions. Based upon the foregoing, Coleman's absences that gave rise to her termination should have been counted as FMLA-covered absences and not considered as the basis for termination. Thus, Coleman's termination was unjustified.

Contrary to Defendants' claim, Coleman did not engage in conduct detrimental to operations. Conduct detrimental to operations was not grounds listed in the termination papers for Coleman (those were limited to attendance violations) but have conveniently appeared here, suggesting that Defendants have fabricated an alternative theory for Coleman's termination in an effort to hide their blatant violation of FMLA. Coleman's "time management" issues during the last two years of her employment were directly related to the FMLA leave she took to care for her daughter, mother, and herself. Instead of counting tardies and absences as FMLA-covered when Coleman provided the required medical certification and time off requests, Defendants used the One Hour Call-Off Policy to give Coleman UAs and suspensions.

Coleman denied using a racial slur against Donald Franklin ("Franklin") and the affidavit of Janice Huff along with Coleman's declaration and deposition testimony establishes that Hammond and Jankowski targeted Coleman for mistreatment and unfair discipline based on her race and that Franklin constantly harassed Coleman. Hammond and Jankowski also wrongly suspended Coleman for being absent from the worksite when she had gone to her car to get migraine medication because IDHS policy permits employees to use sick time in fifteen minute increments. Moreover, Hammond and Jankowski did not enforce IDHS policies against the white employees to the extent that they did against the African-American employees. At a minimum, this evidence creates a question of fact about whether Coleman's conduct was

6

detrimental to operations and supports Coleman's allegations that Defendants discriminated against her because of her race.

### 2. Similarly Situated Employees.

Defendants next contend that Coleman cannot establish a *prima facie* case of race discrimination because she cannot identify any similarly situated employees that were treated more favorably. DE 116, p. 4. Defendants are again wrong.

It is well-settled that an individual is not required to be identical to a plaintiff to qualify as similarly situated. Rather, "the similarly situated inquiry is a flexible one that considers "all relevant factors, the number of which depends on the context of the case."" *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir.2007), aff'd, 553 U.S. 442, 128 S.Ct. 1951, 170 L.Ed.2d 864 (2008). The similarly situated inquiry asks "essentially, are there enough common features between the individuals to allow a meaningful comparison?" *Id. See also Coleman v. Donahoe,* 667 F.3d 835, 846 (7th Cir. 2012) ("Similarly situated employees "must be 'directly comparable' to the plaintiff 'in all material respects,' " but they need not be identical in every conceivable way. . . . We are looking for comparators, not "clone[s]."" (quoting *Patterson v. Indiana Newspapers, Inc*., 589 F.3d 357, 365–66 (7th Cir.2009)); and, *McDonald v. Santa Fe Trail Transportation Co*., 427 U.S. 273, 283 n. 11 (1976) (the Court cautioned that "precise equivalence . . . between employees is not the ultimate question.")

Defendants' claim that the individuals that Coleman identifies as similarly situated are purportedly insufficient fail the similarly situated inquiry. As highlighted above, the fundamental issue in this case is whether Defendants improperly counted Coleman's absences as UAs, as opposed to FMLA-covered absences, and subsequently terminated her based upon the improperly documented UAs. The alleged differences that Defendants rely upon completely overlook this critical issue. Instead, Defendants focus upon differences such as whether the identified individuals met or exceeded expectations for "Use of Time" or whether the individuals occupied the same employment position as Coleman. Because the identified individuals need

7

not be completely identical to Coleman to satisfy the similarly situated inquiry, the identified differences are not fatal to Coleman's claim.

Moreover, contrary to Defendants' assertions, Defendants' treatment of Filomena and Kline is directly comparable to Coleman. Filomena and Kline, two white co-workers, were supervised by Hammond and Jankowski between 2005 and 2009, were subject to the same code of conduct (IDHS and Howe Center policies), and were not disciplined or terminated for taking multiple FMLA leaves. Defendants' disparate treatment of Filomena and Kline provides a "meaningful comparison" and would permit a reasonable jury to infer discrimination. *Id*.

Bill Brundies ("Brundies") is another similarly situated white employee who was treated more leniently. Brundies worked at the Howe Center, was supervised by Hammond, was subject to IDHS and Howe Center policies, and was not disciplined for calling in late for bereavement leave when his grandfather died.

Evidence of selective enforcement of a rule "calls into question the veracity of the employer's explanation." *Olsen v. Marshall & Ilsley Corp*., 267 F.3d 597, 601 (7th Cir.2001); *ac-cord, e.g., Belli Santi v. CNA Ins. Cos*., 88 F.3d 192, 202 (3d Cir.1996) (The plaintiff's "showing that the company did not enforce such a policy" is evidence from which the "jury ... could rationally conclude that the legitimate non-retaliatory reason offered by [the employer] was a pretext for discharging [the plaintiff]."); *Williams v. City of Valdosta*, 689 F.2d 964, 975 (11th Cir.1982) ("It is undisputed, however, that the City's adherence to its formal promotional policy was inconsistent and arbitrary at best. This inconsistency supports the conclusion that resort to the examination requirement was a pretext for singling out Williams for unfavorable treatment."). For these reasons, Coleman has satisfied her burden to state a *prima facie* case for discrimination.

### 3. Gulli Was Involved in the Adverse Employment Action.

Gulli supervised the Howe Center Human Resources Department and controlled the processing of both termination paperwork and FMLA applications. Gulli received Coleman's

8

FMLA application on April 24, 2007, just four days after Hammond and Jankowski submitted their April 20, 2007 recommendation to terminate Coleman. But Gulli did not process Coleman's FMLA application for fifty (50) days. Gulli processed Hammond and Jankowski's termination request much faster. By June 4, 2007, Gulli had forwarded the termination paperwork to labor relations but she waited to approve Coleman's FMLA application until June 13, 2007. In the meantime, on May 15, 2007, Hammond contacted Gulli to inform her that Hammond intended to fire Coleman. One week later, on May 23, 2007, Hammond and Jankowski suspended Coleman pending discharge. Thus, it can be reasonably inferred that Gulli knew about Hammond's decision to terminate Coleman and that Gulli delayed processing Coleman's FMLA application until after Hammond had suspending Coleman pending discharge and after Gulli had processed Hammond's termination recommendation. Thus, Gulli was personally involved in the discrimination against Coleman.

**B. Defendants' Non-Discriminatory Reason is a Pretext.**

Coleman has presented enough evidence of pretext to avoid summary judgment. Once a *prima facie* case is established, a presumption of discrimination is triggered. "The burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason . . . " for its action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). "If the employer meets this burden, the burden shifts back to the plaintiff to demonstrate that the employer's proffered reason is pretextual." *Burks v. Wisconsin Dept. of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006).

To meet this burden, Coleman must "identify such weaknesses, implausibilities, inconsistencies, or contradictions" in Defendants' asserted reason "that a reasonable person could find [it] unworthy of credence." *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007). If the given reason for termination "wasn't what induced him to take the challenged employment action, it was a pretext." *Forrester v. Raulant–Borg Corp.*, 453 F.3d 416, 418 (7th Cir.2006).

9

Coleman did not violate any IDHS policies by calling in late on days when she requested FMLA-covered leave. As argued above in Section A.1, Coleman's late call-ins did not violate IDHS' FMLA policy on notice and, even if the One Hour Call-In Policy applies to FMLA-covered time off (which Coleman disputes), Hammond had the authority to waive that policy, had a good reason to do so (Coleman's medication for her FMLA covered condition caused it), did so for Brundies (and probably for others too), but refused to do so for Hammond. Further, Defendants' actions in terminating Coleman cast suspicion on their motivation. Hammond and Jankowski promised at the April 20, 2007 pre-disciplinary hearing to check on the status of Coleman's FMLA application and back-date her FMLA-covered absences once it was approved. Coleman gave Hammond a copy of her FMLA application on April 24, 2007. Despite this Hammond suspended Coleman pending discharge on May 23, 2007, and falsely stated in her June 2007 termination report that Coleman had *never* submitted her FMLA application. From this evidence a jury could infer that Defendants' reason for terminating Coleman was a pretext.

Moreover, Defendants did not evenhandedly enforce IDHS or Howe Center policies. The evidence of Kline, Filomena, and Brundies as similarly situated employees suggests that Defendants treated them more favorably. "[A] discrimination plaintiff may employ such comparator evidence to discharge her burden at the pretext stage as well as to satisfy the fourth element of her prima facie case." *Coleman v. Donahoe*, 667 F.3d 835, 853 (7th Cir. 2012). A reasonable jury could conclude that the Defendants stated reason for firing Coleman was pretextual because the context, an essential element in the evaluation of Title VII cases, shows an inference that the real reason for Coleman's termination is, at a minimum, questionable. *Id*.

On summary judgment, Coleman is entitled to the reasonable inferences (a) that her late call-ins were caused by the migraine medication she was taking for FMLA-covered condition and could have been waived by Hammond, (b) that Hammond refused to waive the late call-ins because she believed Coleman's oversleeping was Coleman taking advantage of the FMLA, which Hammond believed African-American employees did but white employees did not, and

10

(c) similarly situated employees outside her protected classes received more favorable treatment from Hammond as detailed above in Section A.2. Combined with the additional circumstances discussed above, Coleman's evidence is sufficient to defeat summary judgment on the pretext issue. *Coleman*, 667 F.3d at 856-57 ("the prima facie case and pretext analyses often overlap").

**C. Coleman Can Establish Interference with FMLA Rights.**

Coleman can show that three year willfulness statute of limitations applies, that she was entitled FMLA leave, that she gave sufficient notice of her need for the FMLA leave, and that she was prejudiced by Defendants' interference with her FMLA leave.

Defendants acted intentionally, thus the FMLA's three year statute of limitations applies. *See* 29 U.S.C. § 2617(c)(2). Defendants counted Coleman's time off requests for FMLA-covered absences against her in order to fire her and did so in violation of IDHS' FMLA policy that prohibits using FMLA leave in considering disciplinary measures. Defendants have not testified that any of their actions were mistakes or unintentional. It can be reasonably inferred based on the evidence that Defendants acted willfully in counting her FMLA-covered absences as UAs and using them to terminate her. Accordingly, the FMLA's three year statute of limitations applies and Defendants' actions through at least June 2006 are at issue.

Coleman was entitled to FMLA leave. Coleman's FMLA leave to care for herself was approved by Gulli on June 13, 2007 and was effective as of April 10, 2007. Defendants want this to mean that anything prior to April 10, 2007 could not be considered FMLA leave, however, IDHS policy clearly states that FMLA-covered absences can be retroactively designated when the medical certification is not immediately available. Hammond repeatedly told Coleman that she would back-date Coleman's FMLA-covered absences once Coleman received her FMLA approval. Moreover, Coleman repeatedly informed Hammond of her need for FMLA leave and FMLA-covered absences, provided medical documentation of them directly to Hammond prior to turning in her FMLA application, gave Hammond a copy of her FMLA application and medical certification, and even stated her need for FMLA-covered absences

11

when she called in asking for days off. Coleman has provided sufficient justification to show why the medical certification was not immediately available—she was undergoing tests to determine the cause of the suddenly extreme migraines and then her doctor left for vacation without telling her and without completing the FMLA certification.

Coleman gave sufficient notice of her need for the FMLA leave. Contrary to Defendants' claim, Coleman did not simply call in sick. Coleman called in asking specifically for FMLA-covered absences, explained to Hammond her worsening migraines and need for additional testing, and provided Hammond with doctor's written verification. Hammond verbally confirmed to Coleman that she would back-date the absences as FMLA-covered once Coleman's FMLA application was approved, indicating that Hammond believed Coleman and accepted Coleman's notice to Hammond of her need for FMLA-leave and Coleman's intent to apply for it once her condition was diagnosed and she knew what treatment she would need.

Firing an employee for a valid request for FMLA leave may constitute interference with the employee's FMLA rights as well as retaliation against the employee. *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500 (3d Cir. 2009). Defendants interfered with Coleman's FMLA leave by firing her for calling in late when she took FMLA leave. Hammond never told Coleman that calling in late when she was requesting FMLA-covered days off would result in UAs even though Coleman had provided Hammond with proof of her medical condition and proof that the migraine medication caused her to oversleep. Instead, Hammond repeatedly told Coleman that her requests for FMLA-covered absences would be back-dated as excused. While Coleman took the days off, Defendants interfered by causing Coleman's FMLA absences to be counted against her and used to terminate her. Defendants also interfered with Coleman's FMLA leave by delaying her FMLA application approval while they forged ahead with her termination based on purported attendance violations based on Coleman's FMLA-related absences. Thus, Defendants interfered with Coleman's FMLA leave.

**D.    Coleman Can Establish Retaliation.**

Coleman can establish retaliation because she notified Defendants of her need for FMLA leave before she was fired, she met the legitimate job expectations, and she was treated less favorably than similarly situated employees. Coleman notified Hammond of her need for FMLA leave and her requests for FMLA-covered absences well prior to her termination. Coleman was terminated as of June 20, 2007, but she first notified Hammond of her need for FMLA leave on February 9, 2007. Defendants' argument works only if they ignore:

- the repeated conversations between Hammond and Coleman about Coleman's need for FMLA leave for herself,
- the medical documentation Coleman provided to Hammond to support her need for FMLA leave for herself,
- Hammond's recording of some of Coleman's absences as FMLA-covered,
- Hammond and Jankowski's statement at the April 20, 2007 pre-disciplinary hearing that they would check for her FMLA application before taking further action,
- IDHS' FMLA policies permitting back-dating of FMLA leave, and
- Defendants' own delays in processing Coleman's FMLA application so that her termination could be processed first.

Coleman's evidence shows that Coleman engaged in protected activity long before the discharge process started. "It is well established in the Seventh Circuit that plaintiffs can establish an inference of retaliation by relying on circumstantial evidence such as suspicious timing or evidence that similarly situated employees who did not engage in protected activity received better treatment." *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1114-15 (7th Cir. 2009); *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008). In examining retaliation claims, the Court may consider suspicious timing, ambiguous statements oral or written, "bits and pieces from which an inference of [retaliatory] intent might be drawn," evidence that similarly situated employees were treated differently, and/or an employer's pretextual reason for adverse action. *Coleman* 667 F. 3d. at 845. Moreover, Coleman had already been approved to take FMLA leave to care for her mother and was given UAs for February 24 and 26, 2007 when she used it. Thus, Defendants' argument that Coleman did not apply for FMLA until April 24 is irrelevant to Coleman establishing that she engaged in a protected activity prior to being terminated.

13

To establish unlawful retaliation under the FMLA, a plaintiff need not show that the employer had notice that the plaintiff was specifically invoking an FMLA right; it is sufficient if the plaintiff simply asserts that the employer had notice of the plaintiff's need for leave for an FMLA-related reason. *Dotson v. Pfizer, Inc.*, 558 F.3d 284 (4th Cir. 2009). Application of the mixed-motives analysis in FMLA retaliatory discharge cases is appropriate where discrimination may not have been the sole reason for the discharge but discrimination was a motivating factor in the termination. *Richardson v. Monitronics Intern., Inc*., 434 F.3d 327 (5th Cir. 2005).

**E.     Coleman Was Denied Due Process.**

Defendants' argument that the pre-disciplinary hearing was not a sham and, thus, Coleman was not denied due process is defeated by the evidence. The Friday, April 2, 2007 pre-disciplinary hearing was sham because, contrary to Defendants' claims, Coleman presented her explanations for the late call-ins at the hearing, Defendants already had Coleman's documents related to the UAs, and Defendants agreed that they would check for Coleman's FMLA application before taking further action. Coleman submitted her FMLA application the following Tuesday, April 24, supporting her request for FMLA leave, but Defendants decided to move ahead with her termination anyway and delayed the processing of her FMLA application until after the termination recommendation was approved.

Defendants attempt to circumvent their responsibility for Coleman's termination by claiming that they did not have final decision making authority but this does not relieve them. Under the "Cat's Paw" theory, Defendants' tainted recommendation for Coleman's termination was rubber stamped by department officials. *See, e.g., Metzger v. Ill. State Police*, 519 F.3d 677, 682 (7th Cir. 2008); *Brewer v. Bd. of Trs. of the Univ. of Ill.*, 479 F.3d 908, 917-18 (7th Cir. 2007) (noting potential for employer liability if decision maker merely rubber-stamped a biased subordinate's recommendation); *Shager v. Upjohn*, 913 F.2d 398, 405 (7th Cir. 1990). Hammond and Jankowski as the authors of the termination recommendation and Gulli, who

14

supervised the compilation of Coleman's work history to support the termination recommendation, can be liable.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment should be denied in its entirety.

WHEREFORE, Plaintiff Stacey A. Coleman requests the Court deny Defendants' Motion for Summary Judgment, allow her to proceed to trial on this matter, and for any other relief this Court deems just.

Dated:  November 9, 2012

Respectfully submitted,

**STACEY A. COLEMAN**

By:

*s/ Amy R. Jonker*

Amy R. Jonker (ajonker@dykema.com)

DYKEMA GOSSETT PLLC
10 South Wacker Drive, Suite 2300
Chicago, Illinois  60606
Phone: 312-876-1700
Fax:    312-627-2302
Court-Appointed Counsel for Plaintiff

GR01\172536.1
ID\ARJ - 101258\0006