# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| **STACEY A. COLEMAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **No. 09 C 3596** |
| | ) | |
| **ILLINOIS DEPARTMENT OF HUMAN** | ) | **Judge Joan H. Lefkow** |
| **SERVICES, f/k/a ILLINOIS DEPARTMENT** | ) | |
| **OF MENTAL HEALTH, MICHAEL** | ) | |
| **JANKOWSKI, CHRISTINE HAMMOND,** | ) | |
| **and JERI GULLI,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION AND ORDER

Plaintiff, Stacey A. Coleman alleges race discrimination in violation of Title VII of the

Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, 42 U.S.C. § 1981, 42 U.S.C. § 1983,

interference with her rights and retaliation under the Family and Medical Leave Act ("FMLA"),

29 U.S.C. §§ 2601 *et seq*., and violation of her procedural due process rights under the

Fourteenth Amendment of the United States Constitution against the Illinois Department of

Human Services ("IDHS"), Michael Jankowski, Christine Hammond, and Jeri Gulli (collectively

referred to as "defendants").[1]  Presently before the court is defendants' motion for summary

judgment [dkt. 115].  For the reasons that follow, defendants' motion is granted in part and

denied in part.

---

[1]   The court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 and venue is appropriate under 28 U.S.C. § 1391.  Coleman exhausted her administrative remedies and timely filed this lawsuit within 90 days of receiving a notice of right to sue.  *See Conner* v. *Ill. Dep't of Natural Res.*, 413 F.3d 675, 680 (7th Cir. 2005).

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine issue of fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(c) & advisory committee's notes. The party seeking summary judgment bears the initial burden of proving that there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact is one that might affect the outcome of the suit. *Insolia*, 216 F.3d at 598–99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## BACKGROUND[2]

Coleman began working at IDHS's Howe Development Center ("Howe") in Tinley Park, Illinois as a support services worker in the dietary department. IDHS development centers, such as Howe, were residential programs serving people with severe medical and/or behavioral needs. Most of Coleman's time was spent in the tray line, which was a position that most employees at Howe did not enjoy. Coleman believed that approximately eighty percent of the employees at Howe were African-American while twenty percent were Caucasian.

Hammond was the director of nutrition services. As the director of nutrition services, she oversaw the main kitchen and clinical services at Howe. Her duties also included supervising employees, including Coleman. Jankowski was the dietary manager at Howe. Hammond was Jankowski's supervisor, and Jankowski was Coleman's supervisor. Between 2006 and 2010, Gulli was the director of human resources at Howe. The human resources department processed leaves of absence, discipline, termination, and employee benefits, among other programs. Gulli was never Coleman's supervisor and could not recall if she had ever met Coleman.

---

[2] The facts in the background section are taken from the parties' Northern District of Illinois Local Rule 56.1 statements of fact and construed in the light most favorable to Coleman. Statements of fact unsupported by admissible evidence will not be considered. Additionally, failure to comply with Local Rule 56.1 in responding to a party's statement of facts results in admission of those facts. *See Smith* v. *Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("[F]ailure to respond by the nonmovant as mandated by the local rules results in an admission."); *McGuire* v. *United Postal Serv.*, 152 F.3d 673, 675 (7th Cir. 1998) ("An answer that does not deny the allegations in the numbered paragraphs with citations to supporting evidence in the record constitutes an admission."). In accordance with its regular practice, the court has considered the parties' specific objections and responses and has included in this background section only those portions of the Local Rule 56.1 statements and responses that are appropriately presented, supported, and relevant to the resolution of this motion.

## I.      IDHS's Affirmative Attendance Policy

### A.      Affirmative Attendance/Time Off Requests

The IDHS had an attendance policy which defined unauthorized absences as those for which the time off was not approved.[3]  Employees were allowed five excused absences each year.  The policy also required that employees report to work on time each day.  Additionally, employee requests for benefit time needed to be supported with a time-off form signed by the employee.  The employee needed to submit the request for time off to his or her supervisor, who consulted with the human resources department to determine whether the employee provided sufficient justification for the request.  An employee who missed work due to a medical illness and received an unexcused absence could have the absence letter treated as excused by providing the proper medical certification.  In an emergency, an employee could call in and submit a formal request for time off after returning to work.

### B.      One-Hour Call-In

An employee who planned to miss work on a certain day was required to call in to notify their supervisor at least one hour before their shift started.  The only exception was in cases of extenuating circumstances, such as incapacitation, which prevented an employee from meeting the one-hour call-in requirement.  There were no restrictions on how early an employee could call in before his or her shift.  Regardless of when the call arrived, either an operator at the switchboard or a manager in the kitchen would take the call and record it in the logbook.  If an employee called in less than an hour before the start of his or her shift, the employee was

---

[3]  The IDHS and Coleman's union agreed to the terms specified in the affirmative attendance policy.

required to present proof for why he or she did not call in a timely matter.  If the employee failed

to present such proof, he or she would receive an unauthorized absence.

Eleven unauthorized absences with a call-in, six unauthorized absences with no call, or a

combination of excessive unexcused absences with call-ins or no calls in a twenty-four month

period, resulted in termination.  Gulli and Hammond, in their roles as department supervisors,

had the authority and discretion to waive the one hour call-in requirement.  Hammond had the

final authority to alter an unexcused absence resulting from a late call-in.

### C.      Bereavement

The IDHS attendance policy permitted an employee to use sick time for bereavement.  In

requesting time off for bereavement, an employee had to complete a time-off request form in

advance and submit it for approval.

## II.      IDHS's FMLA Leave Policy

The IDHS's FMLA leave policy permitted an employee to request time off to care for an

immediate family member with a serious health condition or to take time off because of their

own serious health condition.  FMLA leave was not to be considered in disciplining employees

for unauthorized absences under the IDHS's attendance policy.

In order to have an absence covered by the FMLA, an employee needed to submit an

FMLA application to the human resources department.  Included with the application was a

health care provider certification that the applicant's physician needed to complete, which

detailed the nature of the applicant's illness.  The amount of time it took the human resources

department to review an application was dependent on the volume of paperwork being processed

at the time.  If approved, the human resources department notified the applicant's supervisor,

whose signature was required for final approval. After an employee was approved for FMLA leave, the employee could use that leave to take specific days off by completing a request-for-time-off form and presenting it to his or her supervisor.

If an employee required FMLA time prior to completing the paperwork, he or she was required to use accumulated benefit time. If the employee had already used available benefit time, the employee was required to use one of the five excused absences that were allowed each year. Absent extenuating circumstances, the approval date of an employee's FMLA leave was the date the employee requested the blank FMLA documents from the human resources department. The employee had 15 days to return that paperwork to the human resources department. If the employee failed to do so, the approval date for the employee's FMLA leave was the date the employee returned the completed documents to the human resources department. The IDHS FMLA policy instructed an employee who failed to submit this paperwork within 15 days to "contact the Bureau of Labor Relations office immediately." Pl. L.R. 56.1 Ex. 1, Dkt. 124–1, Page ID #756.

When foreseeable, an employee seeking to use FMLA was required to provide their supervisor with 30 days notice. When not foreseeable, however, an employee was required to provide notice as soon as practicable, or within one work day before learning of the need to take FMLA covered time off. Additionally, in an unforeseeable circumstance, the employee could provide "timely notice," meaning notice within two working days of returning to work that the time off was for an FMLA-qualifying reason.

The IDHS's FMLA policy also required that the IDHS notify an employee within two days of approving time off as FMLA-covered. If that notice was given verbally, the policy

required that it be confirmed in writing 10 days later.  The policy forbade retroactive designation of time off as FMLA-covered leave except when the IDHS knew the reason for the time off but was unable to confirm that it was FMLA-qualifying or where the medical certification had not yet been provided.  In such a case, IDHS made a preliminary determination and then notified the employee; if the medical certification later confirmed the absence was for an illness deemed to be FMLA-qualified, the preliminary designation became final.

Hammond did not have decisionmaking authority regarding whether to approve an application for FMLA leave, nor could she assign the date that the leave was approved.  Hammond could, however, approve the requested dates as FMLA leave after the proper paperwork had been processed by the human resources department.  Jankowski's only role in the FMLA approval process was to direct employees to the human resources department if employees requested FMLA leave from him.

**III.  Coleman's Attendance Issues**

**A.  Coleman's Time-Off in 2006 to Care for Her Daughter**

In 2006, Coleman's daughter, who suffered from chronic asthma, was hospitalized after suffering a severe asthma attack and coming down with pneumonia.  After her daughter was released from the hospital, Coleman had to administer special medication to her periodically throughout the day, which caused her to be absent from or late to work on a number of occasions.

In early 2006, Hammond and Jankowski suspended Coleman's employment because of excessive tardiness.  Coleman explained that her daughter's medical condition caused her to be late for work; neither Hammond nor Jankowski informed Coleman that she could take FMLA

7

leave at that time. Coleman's union representative told her that she should request FMLA leave and, on April 6, 2006, Coleman submitted a request for FMLA leave to care for her daughter. Coleman's request was ultimately approved as of April 5, 2006, and she was granted intermittent FMLA leave to care for her daughter's chronic condition. The FMLA leave to care for her daughter expired on January 1, 2007.

### B. Coleman's Time-Off in 2006 to Care for Her Mother

That same year, Coleman missed work because her mother was hospitalized and needed at-home care. Coleman's mother was a double amputee who suffered from paranoid schizophrenia and congestive heart failure; she required 24-hour care. On August 4, 2006, Coleman called in at 6:05 a.m. to request the day off as FMLA-covered to care for her mother.[4] The next day, Coleman submitted a time off request. Hammond told Coleman that she had approved the request for time off. The IDHS's records, however, indicate that Coleman received an unexcused absence for that day.

On September 9, 2006, Coleman's mother was admitted to the hospital for congestive heart failure and remained in the hospital until September 15, 2006. Coleman had to be present at the hospital to make medical decisions. On September 12, 2006, Coleman notified the human resources department, and Gulli sent Coleman IDHS's standard FMLA policy form indicating that she may be eligible for FMLA leave, instructing Coleman to submit a health care provider certification. Pl. L.R. 56.1 Ex. 15, Dkt. 125–13.

On November 13, 2006, Coleman submitted the FMLA request to provide intermittent care for her mother, which was approved that day. Coleman's FMLA leave in connection with

---

[4] Coleman's shift began at 6:00 a.m. for the dates that she called-in late.

caring for her mother expired on April 1, 2007. On November 18 and 19, 2006, Coleman called in to request FMLA leave to care for her mother. Her written request for time off, however, reflects that she asked for accumulated holiday time for November 18 and FMLA leave for November 19. The November 18 absence was treated as unexcused, but the request for November 19 was excused. Pl. L.R. 56.1 Ex. 17, Dkt. 125–15.

### C. Coleman's Time-Off in 2006 and 2007 to Treat Her Migraines

In the fall of 2006, Coleman began suffering from debilitating migraines and was diagnosed with Tennial Migraine Headaches, also known as peri-menopausal migraines. Coleman took medication to treat her condition, and the medication made her drowsy. As a result, Coleman sometimes slept through her alarm and was late for work. Coleman informed Hammond about her medical condition and that her medication caused her to oversleep.

On February 5, 2007, Coleman saw a doctor for a severe migraine and missed work. The migraine continued into the next day causing Coleman to miss work again. Both days, Coleman called in to request FMLA leave.[5] On February 9, 2007, Coleman returned to work and told Hammond that she wanted to take FMLA leave for her absences on February 5 and February 6. Coleman provided Hammond with her doctor's preliminary diagnosis and return to work note, and again explained to Hammond that she was on medication that caused her to oversleep. Hammond treated Coleman's absence on February 5 as an excused absence.

According to Coleman, in the February 9, 2007 conversation, Hammond told Coleman that she would need to use her remaining benefit time until her FMLA application was approved. Coleman told Hammond that her doctor ordered further medical tests over the next two months.

---

[5] Coleman's affidavit does not indicate with whom she spoke when calling in these days.

9

Hammond told Coleman to submit her FMLA application once she received a final diagnosis.

Hammond stated that she would backdate the February 6, 2007 absence as FMLA-covered once

Coleman's FMLA paperwork had been approved by the human resources department.

Hammond did not tell Coleman that she needed to have FMLA paperwork submitted by a certain

date.

On February 9, 2007, Coleman learned that her grandmother had passed away. On

February 10, 2007, Coleman called in an hour before her shift started to request an excused

absence as a bereavement day, but she received an unexcused absence for this day. Then,

between February 24 through February 27, 2007, Coleman called in late to request FMLA leave

to care for her mother. When Coleman returned to work, she provided Hammond with a time-off

request and asked that her absences those days be treated as covered by the FMLA. Hammond

initially approved all four days as covered by the FMLA but later recategorized Coleman's

request to only reflect her absence on February 25, 2007 as covered by the FMLA.

On March 12, 2007, Coleman called in late, requesting two hours of personal time

because of a migraine. She called an hour later asking for the entire day off. The following day,

Coleman requested that her absence from the prior day be treated as FMLA-covered. On

March 13, 2007, Hammond told Coleman that her request would be backdated as FMLA-

covered once her FMLA application was approved.

On March 27 and 28, 2007, Coleman suffered from a severe migraine. On March 27,

2007, Coleman called in late and requested FMLA leave. The next day, Coleman timely called

in and requested two hours of personal time with the hope that she would come into work later

that day. An hour-and-a-half later, Coleman called back and requested the entire day off because

her migraine worsened.  On March 29, 2007, Coleman provided Hammond with a return to work certificate from her doctor and submitted a time-off request asking that her absences from the two prior days be treated as FMLA-covered.  Hammond explained that Coleman needed to first submit the necessary paperwork to the human resources department before she could treat those absences as covered by the FMLA.  Hammond told Coleman that she would count the absences from March 27 and 28, 2007 as excused, and that Hammond would backdate the excused absences as FMLA-covered once Coleman's FMLA application was approved by the human resources department.

On April 2, 2007, Coleman suffered another migraine and called in late to request an excused absence until her FMLA leave was approved.  Hammond treated Coleman's absence as an unexcused absence because she violated the one-hour call-in policy.  The same day, Hammond recategorized Coleman's excused absence from March 27 as an unexcused absence, noting that Coleman only had approval to take FMLA leave to care for her mother.  The same day, Hammond issued Coleman a pre-disciplinary hearing notice based on excessive absences. The hearing was scheduled for April 5, 2007; it was rescheduled at Coleman's request, however, and eventually set for April 20, 2007.  In the interim, on April 10, 2007, Coleman picked up an FMLA application from the human resources department and delivered it to her doctor's office. Coleman's doctor was on vacation at the time.

## IV.    Coleman's Termination

At the hearing on April 20, 2007, two union officials represented Coleman.  Hammond and Jankowski attended, but Gulli did not.  Coleman and her representatives pointed out that Coleman called in late for the dates in question because her migraine medication made her

11

oversleep. Additionally, they noted that Hammond never told Coleman that she would recategorize the absences from February and March 2007 as unexcused. Rather, Coleman believed that those absences would be covered once she completed her FMLA paperwork. Coleman explained that the delay in submitting her FMLA paperwork to the human resources department was due to her doctor's vacation and that she had not previously submitted that paperwork because she was waiting for a final diagnosis from her doctor. As a result of the hearing, the February 27, 2007 unexcused absence (the day Coleman missed to care for her mother) was changed to an excused absence.[6] The IDHS noted that Coleman timely called in requesting FMLA leave for that day and that she had previously requested and been granted FMLA leave to care for her mother.

Hammond and Jankowski told Coleman at the hearing to submit her FMLA paperwork to request intermittent leave for her migraines and they would contact management to determine whether her absences would be approved as FMLA-covered. On April 23, 2007, Coleman picked up the FMLA packet from her doctor, and on April 24, 2007, Coleman submitted her completed FMLA packet to the human resources office and provided a copy to Hammond.

After the hearing, Hammond and Jankowski recommended that Coleman be terminated for excessive unexcused absences. Namely, they relied on Coleman's accumulating sixteen unexcused absences over a twenty-four month period. Included within those sixteen unexcused absences were the eight unexcused absences between February and April 2007—the dates that Coleman believed were counted as covered by the FMLA. Following the hearing, Coleman

---

[6] Coleman did not raise the issue of race discrimination at the April 20, 2007 hearing; however, she discussed the topic with management, and her union representatives raised the issue at a pre-disciplinary hearing unrelated to the April 20, 2007 hearing.

received three additional unexcused absences on April 23, April 26, and May 15, 2007.

Hammond and Jankowski submitted a disciplinary action form to human resources department

listing Coleman's unexcused absences from 2007 in addition to call-in logs and notes from the

pre-disciplinary meeting. The human resources department created a disciplinary packet and

forwarded it to the Human Services Central Office in Springfield, Illinois. From there, the

packet was sent to IDHS's labor relations department, which reviewed the paperwork and then

sent it to the Illinois Department of Central Management Services ("CMS").

CMS had the authority to approve or deny the recommended disciplinary action. On

May 15, 2007, Hammond sent Gulli an email indicating that she anticipated that Coleman would

be terminated. On May 21, 2007, the IDHS suspended Coleman for an abuse of time violation.

On May 23, 2007, Hammond and Jankowski informed Coleman that she was being suspended

pending discharge and instructed her to leave the premises. On June 13, 2007, Gulli approved

Coleman's FMLA leave beginning on April 10, 2007 (the date that Coleman retrieved the FMLA

forms from the human resources department). One week later, on June 19, 2007, CMS approved

Hammond's and Jankowski's recommendation to terminate Coleman's employment with an

effective date of June 20, 2007.

**V.       Coleman's Disciplinary History and Evaluations**

Coleman received annual evaluations from her supervisors. Coleman's evaluations

consistently stated that she needed to improve her use of time. Specifically, in July and August

2005, Coleman was tardy nineteen times, and in 2006, Coleman was tardy on twenty-three

occasions.[7]  Coleman received a one-day suspension for an unauthorized absence on August 4, 2006; a three-day suspension for refusing to work mandatory overtime on August 20, 2006; a five-day suspension for unauthorized absence from the worksite on October 28, 2006 and November 2, 2006; a five-day suspension for unauthorized absences on November 18, 2006 and December 2, 2006; and a five-day suspension for conduct unbecoming a state employee as a result of Coleman's allegedly using a racial epithet against Donald Franklin, an African-American trayline supervisor.

Franklin was also the impetus for Coleman's five-day suspension for being absent from the worksite on October 28, 2006 and November 2, 2006.  Franklin reported Coleman for these absences.  Coleman states that she was present those days.  Coleman explained that she went to her car to retrieve her medicine when she was marked down as absent.  Coleman also states that she called in requesting FMLA leave on November 18, 2006 and was present at work on December 2, 2006.  Moreover, Coleman denied using a racial slur against Franklin.  Hammond and Jankowski, however, discredited Coleman's explanation.  Coleman filed a grievance in connection with her suspension for calling Franklin a racial epithet and her suspension was later reduced to two days.

In connection with her numerous violations of the IDHS attendance policy, from December 2, 2005 to February 2, 2006, Coleman was placed on a period of probation called

---

[7]  With regard to the 2006 violations for excessive tardiness, Coleman states that she was late for work those days because she was caring for her daughter and her mother.  Thirteen of those instances of tardiness occurred before Coleman received FMLA leave to care for her daughter and all twenty-three of the instances of tardiness occurred before Coleman received FMLA leave to care for her mother.  *See* Def. L.R. 56.1 Ex. G, Dkt. 117–6, Page ID 643.

"proof status," and on November 9, 2006 and February 9, 2007, Coleman was referred to the employee assistance program.

Coleman had received position evaluations from 1998 to 2002, and between 2004 and 2005. Coleman's evaluations from 2004 and 2005 stated that, "Stacey has continued to perform her duties well and on occasion has taken TA assignments"; exceeded expectations in certain areas; and "her work was done with correctness and completed with overall quality." Pl. L.R. 56.1 ¶ 38.

## VI.     Other Employees at Howe

### A.     Phyllis Kline

Phyllis Kline, Caucasian, worked at Howe as a support services worker under Hammond and Jankowski's supervision. Kline took FMLA leave five times in four years and refused mandatory overtime in 2006; however, she was not terminated or reprimanded. In September 2007, Kline refused to work overtime due to a pending surgery. Instead of disciplining her, Hammond instructed Kline to obtain a medical certification and her request for FMLA leave would be backdated; Kline suffered no repercussions for failing to work overtime on this occasion.

### B.     Gail Filomena

Gail Filomena, Caucasian, worked at Howe as a support services worker under Hammond and Jankowski's supervision. Filomena took FMLA leave four times in three years. She took one period of intermittent FMLA leave to care for husband and three other times to care for herself. Filomena submitted her paperwork to the human resources department prior to taking approved leave.  In 2007, Filomena contracted bronchitis and requested FMLA leave.

Her request was approved immediately and Filomena was not reprimanded for refusing to work

overtime.[8]

---

[8] Coleman does not indicate whether the human resources department approved Filomena's FMLA request before she refused to work overtime or whether she was even disciplined.

### C.      Bill Brundies

Bill Brundies, also Caucasian, worked at Howe under Hammond and Jankowski's supervision.  He called in late to attend his grandfather's funeral and Hammond and Jankowski permitted him to take a week off from work.  Brundies, however, did not receive an unexcused absence.[9]

### D.      Kerry Fullerton

Kerry Fullerton, Caucasian, worked as a support service worker at Howe under Hammond's supervision.  In 2009, Fullerton had accumulated seventeen absences, nine of which were unexcused.  As a result of her excessive absenteeism, in March 2009, Hammond issued Fullerton a notice of pre-disciplinary hearing.  In response to the notice, Fullerton resigned on April 13, 2009.

### D.      Janice Huff

Janice Huff, African-American, worked at Howe as a support services worker in the dietary department and reported to Hammond and Jankowski.  In February 2007, Huff underwent foot surgery and was granted FMLA leave for the surgery and post-surgical recovery.  Pursuant to her doctor's orders, Huff could not work more than eight hours a day.  Hammond, however, had Huff work overtime.  When Huff informed Hammond about her condition, Hammond and Jankowski suspended her for four days based on refusal to work overtime.  Jankowski told Huff that her FMLA leave had expired; however, Huff called Gulli, who informed her that she still had FMLA leave days.  Huff called her union representative who

---

[9]  Coleman does not indicate when Brundies's grandfather passed away.

contacted Hammond and provided her with Huff's medical documentation; Hammond thereafter

withdrew Huff's suspension.

### E.    Donald Franklin

Donald Franklin, African-American, worked at Howe as a trayline supervisor.  In the fall

of 2006, Coleman complained that Franklin had been harassing her, which exacerbated her

migraines.  Coleman repeatedly asked Hammond and Jankowski to reassign her to avoid

Franklin.  Coleman explained to Hammond and Jankowski of the negative effects that Franklin

had on her migraines; however, they ignored her requests.

## ANALYSIS

### I.    Motion to Strike Janice Huff's Declaration

Defendants have moved to strike Huff's declaration arguing that Coleman failed to

produce it during discovery despite their requests for documents supporting Coleman's claims.

Coleman argues that she disclosed Huff as a witness in her Federal Rule of Civil Procedure

26(a)(1) initial and supplemental disclosures.  In addition, Coleman states that she provided

Huff's affidavit to defendants' counsel via email and during a pre-settlement conference

exchange of position papers.  Neither side, however, can locate the email that Coleman's counsel

sent to defendants' counsel (who subsequently withdrew from the case) enclosing Huff's

affidavit; nor could defense counsel locate the declaration in the files of his former colleague.

Rule 26(a) provides that "a party must . . . provide to the other parties . . . the name . . . of

each individual likely to have discoverable information—along with the subjects of that

information."  Fed. R. Civ. P. 26(a)(1)(A)(i).  Rule 26(e) further imposes a duty to supplement

Rule 26(a) disclosures.  Fed. R. Civ. P. 26(e).  Rule 37 precludes a party who fails to properly

identify a witness from relying on that witness' testimony in support of a dispositive motion. *See* Fed. R. Civ. P. 37(c)(1). Although defendants dispute that they received Huff's declaration, they were undoubtedly aware of her as a potential witness. In addition, that Coleman disclosed the declaration during settlement negotiations undercuts defendants' argument regarding surprise and prejudice. Because defendants were aware of Huff as a potential witness and her declaration more than six months prior to the defendants filing the present motion, the court declines defendants' motion to strike the declaration from Coleman's response.

## II.    Race Discrimination[10]

Coleman alleges that defendants discriminated against her based on race in violation of Title VII, 42 U.S.C. § 1981, and 42 U.S.C. § 1983 by disciplining her for requesting to take FMLA leave.[11] Coleman proceeds under the indirect method of proof as espoused by the Supreme Court in *McDonnell Douglas Corporation* v. *Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). Under this approach, to demonstrate a *prima facie* case of discrimination Coleman must show that (1) she is a member of a protected class; (2) she was meeting the IDHS's legitimate expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of her protected class were treated more favorably.

---

[10]  Although she did not allege a hostile work environment claim in her complaint, Coleman insinuates that she was subjected to a hostile work environment. Defendants moved for summary judgment on this issue and Coleman did not respond. Because Coleman failed to develop any argument in response to defendants' motion for summary judgment regarding a hostile work environment claim, she is deemed to have abandoned any hostile work environment claim. *See Palmer* v. *Marion Cnty.*, 327 F.3d 588, 597–98 (7th Cir. 2003); *De* v. *City of Chicago*, 912 F. Supp. 2d 709, 734–35 (N.D. Ill. Dec. 14, 2012),

[11]  The method of proving discrimination is the same under Title VII, 42 U.S.C. § 1981, and 42 U.S.C. § 1983. *See McGowan* v. *Deere & Co.*, 581 F.3d 575, 579 (7th Cir. 2009); *Williams* v. *Seniff*, 342 F.3d 774, 788 n.13 (7th Cir. 2003).

*Naficy* v. *Ill. Dep't. of Human Servs.*, 697 F.3d 504, 511 (7th Cir. 2012). If Coleman establishes a *prima facie* case, defendants must present evidence showing a legitimate, nondiscriminatory reason for terminating her employment. *Id.* Coleman must then present evidence showing that defendants' stated reason is pretextual. *Id.* at 511–12. The parties do not dispute the first and third prongs of the test as Coleman is African-American whose employment defendants' terminated.[12] The parties do, however, dispute the second and fourth prongs.

### A. Legitimate Employment Expectations

Defendants argue that Coleman's violation of the IDHS's attendance policy compounded with numerous other instances of disciplinary infractions warranted her termination. Coleman, however, contends that defendants should have excused the majority of her unexcused absences as covered by the FMLA. Defendants' reliance on the attendance policy, argues Coleman, was cover for their real reason for terminating her employment, which she contends was motivated by racial animus. In cases like this, where evidence regarding an employer's legitimate expectations becomes inextricably intertwined with the pretext analysis, the court may consider the second prong of the *prima facie* test when examining whether the employer's stated reason for taking an adverse action was pretextual. *See Duncan* v. *Fleetwood Motor Homes of Ind., Inc.*, 518 F.3d 486, 491 (7th Cir. 2008) ("[Where] an employer has cited performance issues as the justification for its adverse action, the performance element of the prima facie case cannot be separated from the question whether the employer proffered a nonpretextual explanation for its challenged conduct."); *Everroad* v. *Scott Truck Sys., Inc.*, 604 F.3d 471, 477–78 (7th Cir. 2010)

---

[12] Coleman does not argue that any prior suspensions she received were adverse actions. Thus, the court only considers her termination as the adverse action giving rise to her discrimination claims.

("In some cases, though, the issue of satisfactory performance and the question of pretext overlap. When the employer asserts as the nondiscriminatory reason for termination that the employee was not meeting legitimate job expectations, the credibility of the employer's assertion is an issue for both the second element of the plaintiff's *prima facie* case and the pretext analysis."). Accordingly, whether Coleman was meeting defendants' legitimate employment expectations will be discussed in section II.C in the pretext analysis.

### B. Similarly Situated Employees

The similarly situated employee inquiry, which calls for a "flexible, common sense" approach, asks whether there are "enough common features between the individuals to allow [for] a meaningful comparison." *Argyropoulos* v. *City of Alton*, 539 F.3d 724, 735 (7th Cir. 2008) (internal quotation marks omitted). While "[s]imilarly situated employees must be directly comparable to the plaintiff in all material respects, which includes showing that the coworkers engaged in comparable rule or policy violations," *Naik*, 627 F.3d at 600 (internal quotation marks omitted), they need not be "identical in every conceivable way." *Coleman* v. *Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012). In order to show that an employee was similarly situated, Coleman must demonstrate that the employee "(1) dealt with the same supervisor, (2) [was] subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish [his or her] conduct or the employer's treatment of [him or her]." *Id*. at 847 (internal quotation marks omitted). When analyzing this final prong of the similarly situated employee test, courts look to whether co-workers "engaged in comparable rule or policy violations and received more lenient discipline." *Id*. at 850 (internal quotation marks omitted).

21

Coleman identifies Caucasian coworkers at Howe who reported to Hammond and Jankowski: Kline, Filomena, Fullerton, and Brundies. Defendants argue that Coleman cannot establish the third prong of the comparator test, namely, that any of her proposed comparators engaged in conduct of comparable seriousness. Defendants also note that, unlike Coleman, Kline, Filomena, and Brundies did not violate the one-hour call-in policy.

First, Coleman argues that Fullerton accumulated seventeen absences, nine of which were unexcused, which should have resulted in her termination under IDHS policy. Defendants, however, note that Fullerton was issued a pre-disciplinary meeting notice after she failed to return from a non-service related disability leave. Fullerton sent a letter resigning and never returned to work at Howe. Fullerton is thus not an appropriate comparator.

Coleman's evidence regarding Kline, Filomena, and Brundies is stronger. With regard to Kline, on one occasion, Kline told Hammond that she was having surgery and was going to take FMLA leave. Hammond permitted Kline to obtain a medical certification and treated Kline's time off as FMLA-covered even though she had not yet formally made the request for leave. Second, Coleman, relying on Huff's affidavit, states that Filomena took FMLA leave after contracting bronchitis and refused to work overtime. She does not indicate, however, whether Filomena had already been approved to take FMLA leave when refusing to work overtime. Coleman, in any event, was suspended for three days for refusing to work overtime. Coleman also states that Brundies called in late to attend his grandfather's funeral but did not receive an unexcused absence. Coleman received an unexcused absence for missing work on the day of her grandmother's funeral despite having requested it as a bereavement day.

22

Although not identical in all respects, Kline, Filomena, and Brundies held similar positions to Coleman, reported to Hammond, and had their leave requests approved immediately or retroactively while Coleman did not. When Coleman missed work and requested to take FMLA or bereavement leave, Hammond was obstinate and treated those absences as unexcused. Coleman has thus identified similarly situated employees necessary to satisfy the third prong of the comparator test. *See Coleman*, 667 F.3d at 851 ("Where a proposed comparator violated the same rule as the plaintiff in an equivalent or more serious manner, court should not demand strict factual parallels."). Accordingly, although her evidence is thin, Coleman satisfied her *prima facie* case.

## C.    Pretext

Defendants provided a legitimate nondiscriminatory reason for Coleman's termination—her attendance violations combined with other disciplinary infractions—shifting the burden back to Coleman to demonstrate that this stated reason was pretext and that the real reason behind her termination was based on discriminatory animus. *See Pilditch* v. *Bd. of Educ. of the City of Chicago*, 3 F.3d 1113, 1117 (7th Cir. 1993) ("But this burden is also quite light; the employer need not persuade the court that he was actually motivated by the reason he gives and the mere articulation of the reason rebuts the prima facie case and puts the onus back on the plaintiff to prove pretext.").

To show pretext, Coleman must demonstrate that the decisionmaker's reasons for her termination were dishonest and motivated by discriminatory animus. *See Brown* v. *Ill. Dep't of Nat. Resources*, 499 F.3d 675, 683 (7th Cir. 2007). "A plaintiff shows that a reason is pretextual 'directly by persuading the court that a discriminatory reason more likely motivated the

23

defendants or indirectly by showing that the defendants' proffered explanation is unworthy of credence.'" *Blise* v. *Antaramian*, 409 F.3d 861, 867 (7th Cir. 2005) (brackets omitted) (quoting *Texas Dep't of Cmty. Affairs* v. *Burdine*, 450 U.S. 248, 256, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)). In determining whether an employer's explanation is honest, courts look to the reasonableness of the explanation. *See Duncan*, 518 F.3d at 492; *Stewart* v. *Henderson*, 207 F.3d 374, 378 (7th Cir. 2000) ("The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise or well-considered."). A plaintiff can present indirect evidence challenging the reasonableness of an explanation by showing that the proffered reasons "are without basis in fact, did not actually motivate the challenged action, or were insufficient to motivate the discharge." *See Freeman* v. *Madison Metro. Sch. Dist.*, 231 F.3d 374, 379 (7th Cir. 2000).

Defendants argue that Coleman's termination was warranted because she failed to comply with IDHS's attendance policy. Specifically, within the twenty-four months prior to her termination, Coleman accumulated 16 unexcused absences, with eight of those unexcused absences coming between February and April 2007. Coleman argues that defendants' application of this policy was discriminatory because Hammond and Jankowski — the decisionmakers — presumed that African-American employees abused FMLA leave. Because of this belief, argues Coleman, Hammond treated Coleman's absences as unexcused rather than allowing her to substantiate that the FMLA excused the absence. To support her pretext argument, Coleman argues that (1) Caucasian employees did not receive similar discipline for being absent from work; (2) her unexcused absences were covered by the FMLA; and (3) her prior disciplinary record was unfounded.

24

First, Coleman argues that Hammond and Jankowski disciplined African-American employees more harshly. Namely, Coleman notes that Kline refused to work overtime because of a pending surgery but was allowed to use FMLA leave even though Kline had not yet formally made the request for FMLA leave. In addition, Huff noted that after her own medical ailments required that she used FMLA leave, Hammond and Jankowski suspended her for four days for refusing to work overtime (although she was later able to have the suspension withdrawn by providing the appropriate paperwork). Furthermore, Coleman believed that Caucasian employees, such as Filomena, had their FMLA paperwork processed faster and were not disciplined for taking FMLA leave. Coleman also points to her unexcused absence when she attended her grandmother's funeral, compared to Brundies's excused absence. *E.g.*, *Coleman*, 667 F.3d at 841 ("In *McDonnell Douglas* itself, the Supreme Court noted that comparator evidence would be "[e]specially relevant" at the pretext stage." (quoting *McDonnell Douglas*, 411 U.S. at 804)).

That Huff had difficulty taking FMLA leave while Caucasian employees did not supports Coleman's theory that race played a role in Hammond's decision regarding when to excuse absences. *See, e.g.*, *Coleman*, 667 F.3d at 857 ("[E]vidence of selective enforcement of a rule calls into question the veracity of the employer's explanation." (internal quotation marks omitted)). Huff's situation was different from Coleman's. Huff had prior-approved FMLA leave because of her surgery and requested to use that leave because she could not work overtime. Huff was initially disciplined based on Jankowski's belief that her FMLA time in connection with the surgery had expired, a mistake that IDHS later rectified. Coleman, however,

25

had not submitted her paperwork requesting FMLA leave to the human resources department when accumulating eight unexcused absences between February and April 2007.

Moreover, Caucasian employees received discipline for calling in late, leaving early, and refusing mandatory overtime, although no Caucasian employee was terminated for these infractions. Pl. Resp. to Defs. L.R. 56.1 ¶ 46. Indeed, Hammond disciplined Fullerton for excessive unexcused absences, and Fullerton resigned as a result. *See, e.g., Naik* v. *Boehringer Ingelheim Pharm., Inc.*, 627 F.3d 596, 600 (7th Cir. 2010) ("[T]he evidence shows that every employee that [the defendant] found to have falsified call logs was either terminated or allowed to resign. There is no evidence that any employee who violated the [defendant's] policy remained on the job."). Apart from Fullerton, Coleman points to no Caucasian employee who over a two-month period of time, continuously called in late requesting unapproved FMLA leave. *E.g.*, *Bean* v. *Wis. Bell, Inc.*, 366 F.3d 451, 453 (7th Cir. 2004) ("The misconduct of the two whites was not so egregious that the fact that they weren't suspended permits an inference that [the plaintiff] was suspended because she is black."). Coleman also argues that Filomena took FMLA leave and refused to work overtime without being disciplined and notes that Hammond allowed Kline to back-date an FMLA request and permitted Brundies to use a bereavement day to care for his grandfather. These were isolated instances, however. The majority of Coleman's discipline stemmed from her calling in less than an hour before her shift while requesting FMLA leave for time off to treat her migraines even though she had not yet

obtained approval from the human resources department to take FMLA leave to treat her migraines.[13]

Furthermore, Coleman's argument that Hammond and Jankowski allowed Caucasian employees to bypass required steps of the IDHS's FMLA policy while disciplining African-American employees for taking FMLA leave is belied by the evidence. First, Hammond and Jankowski had no role in deciding whether to approve FMLA leave; rather, the human resources department had the authority to approve or deny FMLA leave requests. Second, the human resources department approved Coleman's FMLA leave requests in 2006 to care for her mother and her daughter. Third, after Coleman submitted her FMLA paperwork in 2007, the human resources department approved her request to take FMLA leave to treat her migraines. Fourth, between February and April 2007, Hammond told Coleman that she needed to submit her paperwork to the human resources department to obtain FMLA leave, which Coleman failed to do until April 10, 2007. Last, during the April 20, 2007 pre-disciplinary hearing, Hammond and Jankowski recategorized Coleman's absence from February 27, 2007 as covered by the FMLA because Coleman missed work that day to care for her mother. The IDHS granted Coleman FMLA leave every time that she requested it. Coleman's reliance on unsubstantiated innuendo

---

[13] Coleman included Kline and Filomena's personnel files as exhibits. The files include handwritten notes from Kline and Filomena where Kline requested to take leaves of absences in 2005, 2007, and 2009, and Filomena requested leaves of absences in 2007 and 2008 for medical reasons. The files, however, do not provide any information regarding whether Kline or Filomena had already been approved for FMLA leave before they missed time from work or whether they were disciplined for failing to abide by IDHS's attendance and FMLA policies. To show pretext, Coleman must do more than include her co-employees personnel files and indicate that they were able to take FMLA leave. Rather, she must present facts indicating that defendants' decision to terminate her evidenced discriminatory animus. *See Greer* v. *Bd. of Educ. of City of Chi., Ill.*, 267 F.3d 723, 727 (7th Cir. 2001) ("[A] lawsuit is not a game of hunt the peanut. Employment discrimination cases are extremely fact-intensive, and neither appellate courts not district courts are obliged in our adversary system to scour the record looking for factual disputes. . . .") (internal quotation marks omitted).

to suggest that Hammond and Jankowski's actions were the result of a discriminatory animus does not create a genuine issue of material fact for trial. *See, e.g.*, *Goodman* v. *Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010) ("We often call summary judgment, the 'put up or shut up' moment in litigation, by which we mean that the non-moving party is required to marshal and present the court with the evidence she contends will prove her case." (citation omitted)).

Second, with regard to her specific absences, Coleman contends that nine of those unexcused absences charged against her between 2005 and 2007 should not have been counted because those absences were FMLA covered. Specifically, Coleman states that her absences on the following dates were covered under the FMLA: March 4 and August 4, 2006; February 6, 24, 26, and March 12, 27, 28 and April 2, 2007. Coleman contends that her absence on February 10, 2007 to attend her grandmother's funeral should have been treated as a bereavement day. With regard to her absence on March 4, 2006, it is undisputed that Coleman had not yet requested any FMLA leave at that time. Next, Coleman argues that she should have been allowed to take FMLA leave on August 4, 2006 to care for mother; however, she did not receive approval to take FMLA leave to care for her mother until November 13, 2006.[14]

Furthermore, with regard to her unexcused absences in 2007, Coleman argues that she called in for each absence and informed Hammond that she was ill and would use the time off as FMLA-covered. Hammond verbally instructed Coleman to document the absence as covered by

---

[14] Coleman also disputed receiving an unexcused absence on November 18, 2006 as it was covered by the FMLA; however, the IDHS's records do not indicate that Coleman requested that time-off in connection with her FMLA approved leave. The records do reflect that Coleman requested that her absence the following day, November 19, 2006, be treated as FMLA covered and Coleman received no discipline for missing that day.

the FMLA and told her that it would be backdated to reflect as such.  Still, Coleman did not complete her FMLA paperwork until after she accumulated multiple unexecused absences. While Coleman argues that her doctor's delay in diagnosing her condition contributed to her delay in completing the paperwork, Coleman still waited more than two months before picking up the FMLA forms from the human resources department.  The number of unexcused absences Coleman accumulated over a two-month period without obtaining her FMLA paperwork from the human resources department violated IDHS's attendance policy.  Taking the number of unexcused absences over a short period of time combined with Coleman's delay in submitting her FMLA paperwork provided Hammond with a sufficient basis to recommend termination. *See, e.g., Ptasznik* v. *St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006) ("An employer's mistaken belief that the plaintiff's conduct merited termination is not unlawful, so long as the belief was honestly held.").

Third, Coleman argues that her prior disciplinary history was based on unfounded accusations.  Coleman notes that Franklin was the impetus for defendants' decision to discipline her for being absent from the worksite and for using a racially derogatory slur.  Franklin, according to Coleman, harassed her and part of that harassment included reporting her for violations that were untrue.  When Coleman attempted to explain to Hammond and Jankowski that Franklin held a grudge against Coleman, they turned a deaf ear.  Even if they were wrong in this instance, Coleman received numerous other suspensions between 2002 and 2006 for violating IDHS's attendance policy.  For example, in 2006, Coleman was marked tardy twenty-three times and the majority of these instances occurred before Coleman requested FMLA leave to care her daughter. All occurred before Coleman requested FMLA leave to care for her mother.

29

During the same time period, Coleman received some positive evaluations, but her evaluations also consistently criticized her for poor time management. The majority of Coleman's time violations resulted from her failure over an extended period of time to properly call in requesting time off.

Importantly, Coleman fails to show that race played a role in Hammond's decision to discipline Coleman for unexcused absences. Indeed, failure to comply with the IDHS's attendance and FMLA policies, was the underlying reason substantiating all of Coleman's prior disciplinary violations. *See Kariotis* v. *Navistar Int'l Transp. Corp.*, 131 F.3d 672, 677 (7th Cir. 1997) ("[A]rguing about the accuracy of the employer's assessment is a distraction . . . because the question is not whether the employer's reasons for a decision are *right* but whether the employer's description of its reasons is *honest*." (internal quotation marks omitted)).[15] Nor did Coleman identify a non-African-American employee who accumulated a similar number of unexcused absences without facing termination. *Compare with Stalter* v. *Wal-Mart Stores, Inc.*, 195 F.3d 285, 290–91 (7th Cir. 1999) (fact issue as to pretext existed where the defendant terminated the plaintiff for allegedly stealing a bag of chips from a co-employee but failed to terminate a Caucasian employee who lied to her supervisor after missing work when the employer's policy called for termination in instances of employee dishonesty). Because Coleman failed to carry her burden under the indirect method, defendants' motion for summary judgment with respect to her Title VII, § 1981, and § 1983 claims must be granted. *See Brown* v. *Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1106 (7th Cir. 2012) ("Perhaps their supervisors'

---

[15] Whether defendants' application of these policies violated the FMLA is discussed below in section III; however, for the pretext inquiry, the focus is on whether defendants had an honest belief that disciplining Coleman was warranted.

criticisms were unfair—clearly the plaintiffs feel that they were—but there is no evidence that there were unfair *because they were motivated by race*, as Title VII forbids."); *Jones* v. *Union Pacific R. Co.*, 302 F.3d 735, 742 (7th Cir. 2002) ("To establish pretext, [the plaintiff] must show that his race was *the determining factor* in his discharge, or that but for his race he would not have been discharged."); *compare with Loudermilk* v. *Best Pallet Co.*, 636 F.3d 312, 314–15 (7th Cir. 2010) (fact issue remained regarding pretext where African-American employee told his supervisor that he believed he was being treated differently from Hispanic workers and supervisor fired him on the spot).[16]

## III.    FMLA Interference Claim

The FMLA provides eligible employees with the right to take up to twelve weeks of unpaid leave due to a serious health condition or to care for a family member.  *See* 29 U.S.C. § 2612(a)(1).  The FMLA also allows an employee to take intermittent leave or work on a reduced schedule when necessary because of a medical condition.  *Id*. § 2612(b).  Intermittent leave is defined as "leave taken in separate blocks of time due to a single qualifying reason." 29 C.F.R. § 825.203(a) (2006 rev.).[17]  It is unlawful for an employer to interfere with an

---

[16]    Coleman makes a cursory argument that the mixed-motives analysis precludes summary judgment on both her race discrimination and FMLA retaliation claims.  In order to proceed under such a theory, Coleman must present direct or circumstantial evidence of discrimination.  *Grigsby* v. *LaHood,* 628 F.3d 354, 360 (7th Cir. 2010). Defendants could then avoid a finding of liability by establishing that they would have made the same decision even if Coleman was not African–American.  *Abioye* v. *Sundstrand Corp.,* 164 F.3d 364, 369 (7th Cir.1998).  As found, Coleman failed to substantiate that race played a decision in defendants' termination decision.  There is also ample evidence that defendants made the decision to terminate Coleman based on her violation of the attendance policy, and they would have reached the same decision regardless of Coleman's race.

[17]    Congress authorized the Secretary of Labor to promulgate regulations necessary to implement the FMLA.  *See* 29 U.S.C. § 2654; *Burnett* v. *LFW, Inc.*, 472 F.3d 471, 477 n.1 (7th Cir. 2006).  The court applies the version of the Code of Federal Regulations in effect during the events in

(continued...)

employee's rights under the FMLA by terminating her employment. 29 U.S.C. § 2615(a)(1). The plaintiff has the burden to prove that her employer interfered with her FMLA rights. *See, e.g.*, *Simpson* v. *Office of Chief Judge of Circuit Court of Will Cnty.*, 559 F.3d 706, 712 (7th Cir. 2009).

To prevail on a claim for FMLA interference, a plaintiff must demonstrate that (1) she was eligible for protection under the FMLA, (2) her employer was covered by the FMLA, (3) she was entitled to leave under the FMLA, (4) she provided notice of her intent to take FMLA leave, and (5) her employer denied her the FMLA benefits to which she was entitled. *Burnett*, 472 F.3d at 477. The parties do not dispute that Coleman was eligible for protection under the FMLA and that IDHS was covered by the FMLA. Defendants argue that the statute of limitations bars Coleman's FMLA claims, and alternatively that she cannot demonstrate the final three prongs of the test.

### A.    Statute of Limitations

Defendants argue that Coleman's FMLA claims are governed by a two-year statute of limitations. *See* 29 U.S.C. § 2617(c)(1) (providing for a two-year statute of limitations). Because Coleman filed her initial complaint on June 15, 2009, defendants contend that any acts or events giving rise to her FMLA interference claim before June 15, 2007 (*i.e.*, Coleman's entire case) are barred by the statute of limitations. Coleman, however, argues that a three-year statute of limitations applies because defendants acted wilfully and, therefore, her claims are timely. *See* 29 U.S.C. § 2617(c)(2).

---

[17](...continued)
question. *See Righi* v. *SMC Corp.*, 632 F.3d 404, 408–09 ("The Department of Labor has issued detailed regulations governing the notice requirement. The regulations were most recently amended in 2009; we apply the version in effect as of July 2006—when these events occurred—to inform our analysis.").

Wilful violations of the FMLA require showing that the employer "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FMLA]." *See McLaughlin* v. *Richland Shoe Co.*, 486 U.S. 128, 133, 108 S. Ct. 1677, 100 L. Ed. 2d 115 (1988); *Archie* v. *Dart,* No. 09 C 7857, 2012 WL 1986431, at *5 (N.D. Ill. June 1, 2012). Here, Coleman notified Hammond that she had a medical issue starting in February 2007. Coleman contends that she forwent submitting her FMLA paperwork at the time because Hammond verbally told her that her time off would later be covered by the FMLA. The IDHS's FMLA policy, however, did not cover time off requests predating submission of FMLA paperwork to the human resources department. That Hammond was on notice of Coleman's request for FMLA leave and told her that the requests would ultimately be covered under the FMLA, but treated those requests as unexcused absences suffices to show a reckless disregard on Hammond's part when instructing Coleman on what she needed to do in order to take FMLA leave. Coleman can thus rely on a three-year statute of limitations as she demonstrated that a willful violation wrongfully denied her benefits under the FMLA. *See, e.g.*, *Wilkes* v. *Potter*, No. 05 C 4921, 2006 WL 3087097, at *6 (N.D. Ill. Oct. 27, 2006).

### B.    Entitlement to FMLA Leave

An employee is entitled to FMLA leave if (1) she is affected with a "serious health condition," and (2) the condition renders her unable to perform the functions of her job. *Burnett*, 472 F.3d at 477–78 (citing 29 U.S.C. § 2612(a)(1)(D)). A "serious health condition" is "an illness, injury, impairment, or physical or mental condition that involves . . . inpatient care in a hospital . . . or . . . continuing treatment by a health care provider." 29 U.S.C. § 2611(11). The term treatment "includes (but is not limited to) examinations to determine if a serious health

condition exists and evaluations of the condition . . . [but] does not include routine physical examinations . . ." 29 C.F.R. § 825.114(b). An employee must submit a medical certification to establish the existence of such a condition. *See* 29 U.S.C. § 2613(a).

Defendants first dispute that Coleman suffered from a FMLA-qualifying medical condition that precluded her from performing the functions of her position. Coleman states that she suffered from debilitating migraines, which required numerous visits to her doctor, who ordered diagnostic tests. Migraines fall under the rubric of health conditions that constitute serious health conditions under the FMLA. *See* 29 C.F.R. § 825.11(c) ("Ordinarily, unless complications arise, the common cold, the flu, ear aches, upset stomach, minor ulcers, *headaches other than migraine*, routine dental or orthodontia problems, periodontal disease, etc., are examples of conditions that do not meet the definition of a serious health condition and do not qualify for FMLA leave." (emphasis added)). Coleman also demonstrated that her migraines precluded her from working certain days, thus demonstrating that her medical condition rendered her unable to perform her job.

## C. Notice of Intent to Take FMLA Leave

In order to invoke her FMLA rights, an employee "must simply provide enough information 'to place the employer on notice of a probable basis for FMLA leave.'" *Righi* v. *SMC Corp.*, 632 F.3d at 409 (quoting *Aubuchon* v. *Knauf Fiberglass, GmbH*, 359 F.3d 950, 953 (7th Cir. 2004)); *see also Burnett*, 472 F.3d at 478–79. The employee need not specifically refer to the FMLA so long as she "alert[ed] [her] employer to the seriousness of the health condition." *Stevenson* v. *Hyre Elec. Co.*, 505 F.3d 720, 725 (7th Cir. 2007). The burden is on the employer to investigate and conduct further inquiry into whether the employee's leave is covered under the

FMLA. *See Burnett*, 472 F.3d at 480. Defendants argue that Coleman never conveyed the severity of her illness before requesting the FMLA paperwork, and additionally failed to comply with its internal notification policy by timely providing a medical certification.

Defendants first argue that Coleman never conveyed the severity of her illness that resulted in her absences between February and April 2007. While an employee need not specifically refer to the FMLA to put an employer on notice, *Burnett*, 472 F.3d at 478–79, the employee must do more than call in informing her employer that she is sick. *See Phillips* v. *Quebecor World RAI, Inc.*, 450 F.3d 308, 312 (7th Cir. 2006) ("An employee's reference to being 'sick,' however, does 'not suggest to the employer that the medical condition might be serious or that the FMLA otherwise could be applicable." (internal quotation marks omitted)). "This is true even if the employee provides her employer with a doctor's note if the note does not convey the seriousness of her medical condition." *de la Rama* v. *Ill. Dep't of Human Servs.*, 541 F.3d 681, 687 (7th Cir. 2008). Here, Coleman specifically told Hammond that she was requesting FMLA leave for all her absences between February and April 2007 due to chronic migraines. Coleman provided Hammond with notes from her doctor indicating that he was treating her for migraines and was performing diagnostic tests. Defendants thus were on notice that Coleman intended to use FMLA leave for those absences placing the onus on them to determine whether the FMLA was applicable. *See Price* v. *City of Fort Wayne*, 117 F.3d 1022, 1026 (7th Cir. 1997) ("After a notice of this sort the employer can inquire further to determine if the FMLA applies.").

Defendants further argue that Coleman never provided a certification from her doctor contemporaneously with her requests that her absences between February and April 2007 be

counted as FMLA leave. *See* 29 C.F.R. § 825.305(c); *Phillips*, 450 F.3d at 312 ("After an employee requests leave for a serious health condition, the employer may request certification by the employee's health care provider."). The IDHS's FMLA policy required that an employee notify his or her supervisor of an intent to treat unforeseeable absences as FMLA covered within two days and, thereafter, the employee must request FMLA forms from the human resources department and submit a medical certification from a physician. *See also* 29 C.F.R. § 825.303(a) ("When the approximate timing of the need for leave is not foreseeable, an employee should give notice to the employer of the need for FMLA leave as soon as practicable under the facts and circumstances of the particular case. It is expected that an employee will give notice to the employer within no more than one or two working days of learning of the need for leave, except in extraordinary circumstances where such notice is not feasible."). IDHS's internal policy required that Coleman submit the certification to the human resources department in connection with her FMLA packet. *See also* 29 C.F.R. § 825.302(d) ("An employer may require an employee to comply with the employer's usual and customary notice and procedural requirements for requesting leave."). The employer must make the request for a medical certification in writing unless the employee has been provided with the employer's FMLA policy in the prior six months; in such a situation, the request for a medical certification can be made orally. *See Ridings* v. *Riverside Med. Ctr.*, 537 F.3d 755, 767 (7th Cir. 2008) (citing 29 C.F.R. §§ 825.305(a), (b)(1)(ii)).

Coleman waited until April 10, 2007 to request FMLA paperwork from the human resources department, and waited until April 24, 2007 to submit her FMLA paperwork for that time off. In accord with IDHS's FMLA policy, the human resources department approved her

request for FMLA leave to treat her migraines beginning on April 10, 2007 (the date that Coleman picked up her forms). Coleman was also familiar with the IDHS's FMLA policy, and its requirement that the human resources department process approvals, because she had requested FMLA leave on two prior occasions to care for her mother and daughter.

Coleman, however, states that she told Hammond that she was taking FMLA leave for each absence in dispute between February and April 2007. Coleman notes that she explained to Hammond that her doctor was awaiting the results of tests to diagnose her condition. According to Coleman, between February and March 2007, Hammond instructed her to submit the FMLA paperwork and said that once human resources approved the request, she would treat Coleman's unexcused absences as covered by the FMLA. In making these assurances, Hammond never told Coleman that there was a deadline by which she had to submit her FMLA paperwork. Nor did Hammond tell Coleman that failure to timely submit a certification could result in denial of leave as FMLA covered. *See* 29 C.F.R. § 825.305(d) ("At the time the employer requests certification, the employer must also advise an employee of the anticipated consequences of an employee's failure to provide adequate certification.").

Hammond's statements to Coleman that her absences would be covered once her FMLA leave was approved were incorrect under IDHS's FMLA policy because FMLA leave could only be approved after the employee picked up forms from the human resources department. Coleman had some familiarity with the IDHS's FMLA policy based on her prior requests; however, Hammond's contradictory instructions lulled Coleman into a false sense of security in that she believed her absences due to her migraines would eventually be treated as excused and covered by the FMLA even though she had not submitted her paperwork to the human resources

department. Coleman waited to collect these forms under the mistaken belief that her time off requests would be excused once she had a final diagnosis from her doctor. Although Hammond did not have the ability to approve time off as FMLA covered, her conversations with Coleman placed defendants on notice of Coleman's intent to take FMLA leave in connection with her migraines. *See Burnett*, 472 F.3d at 479 n.4 ("Because adequacy of notice is a fact-rich question, it is perhaps best resolved by the trier of fact, particularly, where, as is the case here, the employer and employee dispute the quantity and nature of communications regarding the employee's illness.").

### D. Denial of FMLA Benefits

To prevail on the last element of her claim Coleman must show that defendants denied her FMLA benefits to which she was entitled. *See Makowski* v. *SmithAmundsen LLC*, 662 F.3d 818, 825 (7th Cir. 2011). Under the FMLA, termination can constitute a denial of benefits. *See Nicholson* v. *Pulte Homes Corp.*, 690 F.3d 819, 827 (7th Cir. 2012); *Kaufman* v. *Federal Exp. Corp.*, 426 F.3d 880, 884 (7th Cir. 2005). To rebut a claim that an employee's termination denied her FMLA benefits, the employer may present evidence to show that the employee would have been fired regardless of whether she took leave. *See Pagel* v. *TIN Inc.*, 695 F.3d 622, 629 (7th Cir. 2012). The employee must then overcome the employer's evidence to prevail on summary judgment. *Id.*

Defendants argue that they terminated Coleman based on her accumulation of unexcused absences. Coleman argues that she believed her unexcused absences between February and April 2007 would be covered by the FMLA *after* she submitted her FMLA paperwork to the human resources department. Coleman delayed submitting her FMLA paperwork based on

Hammond's assurances that her requests would be backdated. This delay resulted in Coleman accumulating absences deemed to be unexcused. That the human resources department later approved Coleman's request to take FMLA leave demonstrates that these absences would have been excused had Coleman submitted her FMLA paperwork contemporaneously with the absences.

In addition, had those absences been covered by the FMLA, Coleman would not have accumulated excessive unexcused absences, which was the reason for her termination. Accordingly, because Coleman demonstrated that defendants would have lacked grounds to terminate her employment had she received FMLA leave for her absences between February and April 2007, Coleman satisfied her burden demonstrating that defendants denied her FMLA benefits. Accordingly, defendants' motion for summary judgment with respect to Coleman's FMLA interference claim is denied.[18]

## III.    FMLA Retaliation Claim

Coleman also alleges a FMLA retaliation claim. The difference between a retaliation claim and an interference claim is that the former "requires proof of discriminatory or retaliatory

---

[18]  Although the Seventh Circuit has not addressed whether public employees may be held liable under the FMLA, other judges in this district have found individual liability in this context. *See McGee* v. *City of Chicago*, No. 11 C 2512, 2011 WL 4382484, at *8 (N.D. Ill. Sept. 16, 2011); *Plaxico* v. *Cnty. of Cook*, No. 10 C 272, 2010 WL 3171495, at *5 (N.D. Ill. Aug. 11, 2010). *But see Mitchell* v. *Chapman*, 343 F.3d 811, 832 (6th Cir. 2003) (concluding that the FMLA's individual liability provision does not extend to public agencies). A person may be individually liable under the FMLA if he or she had supervisory authority over the plaintiff and was partly responsible for the alleged violation. *See Baier* v. *Rohr-Mont Motors, Inc.*, No. 12 C 8234, 2013 WL 2384269, at *5 (N.D. Ill. May 29, 2013) (citing *Robinson* v. *Morgan Stanley,* No. 06 C 5158, 2007 WL 2815839, at *13–14 (N.D. Ill. Sept. 24, 2007)). Because Coleman does not argue that Gulli or Jankowski had any conversations regarding the approval date of her FMLA leave, she cannot maintain her FMLA interference claim against them in their individual capacities. Accordingly, defendants' motion for summary judgment regarding Coleman's FMLA interference claim is granted with regard to Gulli and Jankowski.

intent while [the latter] requires only proof that the employer denied the employee his or her entitlements under the Act." *Kauffman*, 426 F.3d at 884. A plaintiff may establish an FMLA retaliation claim under either the direct or indirect method of proof. *See, e.g.*, *Caskey* v. *Colgate-Palmolive Co.*, 535 F.3d 585, 592–93 (7th Cir. 2008). Coleman attempts to proceed under both methods.

### A.    The Direct Method

Under the direct method, Coleman must establish (1) a statutorily protected activity; (2) a materially adverse action taken by defendants; and (3) a causal connection between the two. *Ames* v. *Home Depot U.S.A., Inc.*, 629 F.3d 665, 670 (7th Cir. 2011). The second element is not in dispute as defendants terminated Coleman's employment.

Defendants argue that Coleman cannot establish the first element because Coleman failed to properly give notice of her request for FMLA leave before her termination proceedings on April 20, 2007 and, therefore, she had not engaged in a statutorily protected activity. As found, however, between February and April 2007, Coleman repeatedly told Hammond that she was requesting time off under the FMLA as a result of her migraines. Although Coleman failed to give written notice to the human resources department before her disciplinary proceeding, her conversations with Hammond requesting FMLA leave were sufficient to constitute a statutorily protected activity.

Under the third prong of the direct method, Coleman must establish a causal connection between her requests for FMLA leave and her resulting termination. Coleman can establish this causal link either with a direct admission (*i.e.*, a smoking gun admission by defendants that they terminated her employment because she took FMLA leave) or by means of circumstantial

evidence to show unlawful retaliation. *See Pagel*, 695 F.3d at 631. "[C]ircumstantial evidence may include suspicious timing, ambiguous statements from which a retaliatory intent can be drawn, evidence of similar employees being treated differently, or evidence that the employer offered a pretextual reason for the termination." *Id.*[19]

Coleman has no direct evidence that her decision to request FMLA approval factored into defendants' decision to terminate her. Instead, Coleman relies on circumstantial evidence, namely the suspicious timing of the termination decision and the delay approving her FMLA paperwork after she submitted it. It is undisputed that Coleman was terminated less than two months after submitting her FMLA paperwork. Suspicious timing, however, by itself cannot bridge the gap to show a causal connection. *See O'Leary* v. *Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011) ("[T]emporal proximity between an employee's protected activity and an adverse employment action is rarely sufficient to show that the former caused the latter."). Apart from suspicious timing, the pieces of circumstantial evidence upon which Coleman relies to show retaliation are the same arguments that she makes regarding pretext under the indirect method. Thus, the court will address those argument in its pretext analysis *infra* in section III. B.

### B.    The Indirect Method

To proceed under the indirect method, Coleman must establish that she (1) engaged in a statutorily protected activity; (2) met her employer's legitimate expectations; (3) suffered an adverse employment action; and (4) was treated less favorably than similarly situated employees who did not engage in the statutorily protected activity. *Simpson*, 559 F.3d at 718. If Coleman

---

[19]  To substantiate her retaliation claim, Coleman additionally argues that she took pre-approved FMLA leave from February 24 to 27, 2007 to care for her mother. Coleman's absences on February 25 and 27, however, were not ultimately counted against Coleman as unexcused.

makes this *prima facie* showing, the burden shifts to defendants to offer a nondiscriminatory

legitimate reason for her termination. *Id.* If defendants make that showing, the burden shifts

back to Coleman to demonstrate that defendants' explanation for her termination was pretextual.

*Id.*

The ultimate issue boils down to whether defendants' decision to terminate Coleman was

pretextual—namely because Coleman exercised her FMLA rights. The evidence, however, does

not support Coleman's position that her termination was the result of her invoking leave under

the FMLA. The IDHS's FMLA policy required Coleman to submit her paperwork to the human

resources department. Coleman delayed in doing so for two months based on Hammond's

assurances. While Coleman argues that Hammond disciplined her for taking leave, the evidence

shows that Hammond disciplined Coleman because she failed to timely submit the necessary

paperwork to the human resources department, which would allow defendants to verify whether

her medical condition qualified for FMLA coverage.

Moreover, the IDHS approved Coleman's two prior requests to take FMLA leave to care

for her daughter and her mother. Hammond and Jankowski later recatogorized Coleman's

February 27, 2007 unexcused absence to care for her mother as covered by the FMLA. That

Hammond and Jankowski granted Coleman leave under the FMLA when it had already been

approved by the human resources department, but denied her requests that had not received such

approval further underscores that they were following IDHS's internal policies. This distinction

evidences a guided decisionmaking process, which belies Coleman's argument that the

decisionmaking process was retaliatory. In addition, the IDHS ultimately approved Coleman's

FMLA request to take leave in connection with her migraines. While that approval ultimately

came too late, that defendants approved Coleman's FMLA request belies her argument that her termination stemmed from her request for FMLA leave.

Because Coleman cannot establish evidence of a retaliatory motive, her retaliation claim fails. Accordingly, defendants' motion for summary judgment on Coleman's FMLA retaliation claim is granted. *See, e.g.*, *Kauffman*, 426 F.3d at 885 ("Viewing the record in the light most favorable to [the plaintiff], the nonmoving party, [the decisionmakers] wanted to get rid of him because they thought he was argumentative and a troublemaker, so they pounced on a chance to fire him. But they did so *in spite of* his rights under the FMLA, not *because* he asserted those rights. In other words, they did not seek to punish him for exercising rights or opposing an unlawful procedure; they did not even treat him differently than someone not entitled to FMLA leave."); *Ridings*, 537 F.3d at 772 ("[The defendant] was permitted by the FMLA to require [the plaintiff] to substantiate her continued need for a reduced schedule, and it terminated her in accordance with the FMLA and its employment policies, after giving her repeated opportunities to provide the information it had requested. An employer cannot be deemed to retaliate against an employee by asking her to fulfill her obligations under the FMLA.").

## IV.    Deprivation of Due Process Claim

To establish a claim for violation of procedural due process under the Fourteenth Amendment, a plaintiff must demonstrate "(1) a deprivation of a protected interest, and (2) insufficient procedural protections surrounding the deprivation." *Michalowicz* v. *Vill. of Bedford Park*, 528 F.3d 530, 534 (7th Cir. 2008). Defendants do not dispute that Coleman had a protected property interest, focusing instead on the second inquiry. "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a

meaningful matter.'" *Matthews* v. *Eldridge*, 424 U.S. 319, 333, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976) (quoting *Armstrong* v. *Manzo*, 380 U.S. 545, 552, 85 S. Ct. 1187, 1191, 14 L. Ed. 2d 62 (1965)). "Due process requires that, prior to termination, an employee be given the chance to tell her side of the story, and that the agency be willing to listen." *Ryan* v. *Ill. Dep't of Children & Family Servs.*, 185 F.3d 751, 762 (7th Cir. 1999).

Defendants argue that the April 20, 2007 disciplinary hearing provided Coleman with an opportunity to respond to the charges in the April 2, 2007 pre-disciplinary hearing notice. Coleman contends that the April 20, 2007 hearing was in effect "a sham" because defendants' decision to terminate her employment had already been made. Coleman notes that she filed her FMLA paperwork shortly thereafter, on April 24, 2007, and that Hammond and Jankowski stated that they would consider her application before taking further action. Still, according to Coleman, Hammond and Jankowski moved ahead with her termination decision and Gulli delayed the processing of her FMLA paperwork to ensure that their decision to terminate her would be approved.

The termination proceeding was delayed twice at Coleman's behest so that she could prepare. At the proceeding, Coleman was represented by two union officials, who argued that her unexcused absences were the result of an illness that was covered by the FMLA. Hammond and Jankowski also recatogorized Coleman's absence on February 27, 2007 as excused based on the fact that she was taking care of her mother that day, an activity for which she had already been granted FMLA leave. Although Coleman argues that defendants should have waited until her FMLA request had been processed, that request would only have covered absences after April 10, 2007, which was the date that Coleman requested paperwork from the human resources

44

department.  In other words, Coleman's subsequent filing of her FMLA paperwork could not obviate her prior failure to provide contemporaneous notice of her intent to invoke the FMLA. Coleman's failure to provide the initial requisite notice, not the human resources department's alleged delay in processing that paperwork once received, was the reason that Coleman's unexcused absences were not treated as covered by the FMLA.[20]

While Hammond and Jankowski ultimately made the recommendation to terminate Coleman before receiving her FMLA paperwork, that decision had to pass through several levels of review.  Coleman argues that the review process was a mere formality because Hammond and Jankowski's tainted pre-determined recommendation to terminate her employment was rubber stamped.  Still, Hammond and Jankowski's decision to recategorize a prior unexcused absence belies Coleman's argument that they had a pre-determined agenda to terminate her before holding the hearing.  Indeed, such a decision on their part evidences a willingness to listen and accept Coleman's corrections regarding absences that they erroneously concluded were not FMLA covered.  Coleman has thus failed to show that the hearing was a sham such that her due process rights were violated in that the decision to terminate her had been made before that meeting.  Accordingly, defendants' motion for summary judgment regarding Coleman's due process claim is granted.  *See Salas* v. *Wis. Dep't of Corrections*, 493 F.3d 913, 928 (7th Cir. 2007) ("[The plaintiff] was given a chance to explain his side of the story with a union representative present, the [defendant's] decision went through multiple levels or review, and

---

[20]  The time that it took the human resources department to process Coleman's FMLA leave request for her migraines was approximately the same amount of time that it took to process her prior requests.  This fact further undercuts Coleman's argument that defendants intentionally delayed processing Coleman's FMLA paperwork so that they could effectuate her termination.

[the plaintiff] has offered no evidence from which a jury reasonably could conclude that the [defendants] had made up their minds before the hearings occurred.").

## CONCLUSION

For the aforementioned reasons, defendants' motion for summary judgment [dkt. 115] is granted with respect to Coleman's claims for race discrimination in violation of Title VII, § 1983, and § 1981; interference with rights under the FMLA as to Jankowski and Gulli, retaliation in violation of the FMLA against all defendants; and deprivation of due process in violation of the Fourteenth Amendment. Defendants' motion for summary judgment is denied with regard to Coleman's FMLA interference claim against the IDHS and Hammond. The case will be called for a status hearing on October 15, 2013 at 8:30 a.m. The parties are directed to engage in a sincere effort to settle this case and to report on their progress at the status hearing.

ENTER:

Dated: September 24, 2013

_____
JOAN HUMPHREY LEFKOW
United States District Judge